**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **CAROL L. ALLEN,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    **NO. 3:14-cv-01544** |
| | )    **JUDGE CRENSHAW** |
| **NANCY BERRYHILL,** [1] | ) |
| **Acting Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION

Pending before the Court is Carol L. Allen's Motion for Judgment on the Administrative Record ("Motion") (Doc. No. 12), filed with a Memorandum in Support (Doc. No. 13). Commissioner of Social Security ("Commissioner") filed a Response in Opposition to the Motion. (Doc. No. 14.) On July 31, 2014, this case was referred to a Magistrate Judge. (Doc. No. 3.) The Court hereby withdraws that referral. In addition, upon consideration of the parties' filings and the transcript of the administrative record (Doc. No. 10),[2] and for the reasons stated herein, the Court will grant the Motion. (Doc. No. 12.) The Commissioner's decision is reversed and remanded pursuant to 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum Opinion.

## I. INTRODUCTION

Allen filed an application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act on December 10, 2010, alleging a disability onset of December 30, 2007,

---

[1] Nancy Berryhill became Acting Commissioner for the Social Security Administration on January 23, 2017.

[2] Referenced hereinafter by page number(s) following the abbreviation "Tr."

which was later amended to January 20, 2010. (Tr. 11.) Allen's claim was denied at the initial

and reconsideration stages of state agency review. (Tr. 47–50, 61–63.) Allen subsequently

requested de novo review of this case by an Administrative Law Judge ("ALJ"). The ALJ heard

the case on January 22, 2013, and Allen appeared with counsel. (Tr. 27–44.) Allen and an

impartial vocational expert testified at the hearing. (Id.) At the conclusion of the hearing, the ALJ

took the matter under advisement until March 5, 2013, when the ALJ issued a written decision

finding Allen not disabled. (Tr. 11–22.) That decision contains the following enumerated

findings:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2012.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of January 20, 2010 through her date last insured of December 31, 2012 (20 C.F.R. 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: depression, anxiety, post-traumatic stress disorder, diabetes mellitus, minimal degenerative joint disease of right shoulder, sacralization of the lumbar spine, arthritis of the knee, obesity, and psoriasis (20 C.F.R. 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) with the following additional limitations: may occasionally climb ramp or stairs, but must never climb ropes, ladders or scaffolds; may occasionally balance, stoop, kneel, crouch, or crawl; must avoid all exposure to extreme temperatures, vibrations, pulmonary irritants and hazardous [sic] such as dangerous machinery; and understand, remember and perform simple and detailed one to three steps tasks, able to maintain concentration for at least two hours, able to sustain an ordinary work routine around others and make acceptable simple and detailed work-related decisions, able to appropriately interact with the general public and supervisors, able to handle infrequent changes and travel, may have

occasional disruptions from psychological symptoms, and able to maintain basic standards of neatness and cleanliness.

6. Through the date last insured, the claimant was capable of performing past relevant work as an optometry technician and customer clerk. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. 404.1565).

7. The claimant was not under a disability, as defined in the Social Security Act, at any time from January 20, 2010, the alleged onset date, through December 31, 2012, the date last insured (20 C.F.R. 404.1520(f)).

(Tr. 13, 15, 21.)

On May 30, 2014, the Appeals Council denied Allen's request for review of the ALJ's decision, thereby rendering that decision the final decision of the SSA. (Tr. 1.) This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g).

## I.     Review of the Record[3]

Allen has a long history of depression and anxiety due to physical and sexual abuse as a child. (Tr. 158–59, 174–77, 230–31.) In October 2010, she presented at Life Care Family Services suffering from depressed mood, crying spells, anhedonia, sleep disturbance, irritability, loss of motivation, fatigue, social isolation, difficulty concentrating, hopelessness, fear of dying, and panic attacks. (Tr. 230.) As a result, she was diagnosed with major depressive disorder, anxiety disorder, and post-traumatic stress disorder ("PTSD"), with a global assessment of functioning ("GAF") score of 45. (Tr. 231.) Allen continued to struggle with severe depression, inattentiveness, anxiety, and trouble sleeping. (Tr. 308, 331, 338–39, 341, 343.) Her doctor prescribed medication for her depression and anxiety. (See Tr. Ex. 1F.) She also participated in psychotherapy sessions with Dr. Daniel Wood from 2008 to 2012. (Tr. 244, 340, 516.)

---

[3] Allen's Statement of Errors centers on her treating psychiatrist. Accordingly, the Court's Review of the Record will focus only on her history of mental impairments.

Dr. Michael Loftin performed a consultative psychological evaluation of Allen on April 8, 2011. (Tr. 242.) Dr. Loftin observed that Allen was oriented to person, place, and mostly to time, was alert, appeared at least mildly irritated, and her thought processes included seemingly clear and logical thinking. (Tr. 245.) Dr. Loftin noted that Allen was able to perform some tasks successfully, such as spelling her name backwards, recalling all three named items immediately after they were said to her, and correctly spelling "world." (Id.) However, he also noted that she performed poorly in the Digit Span tasks, was unable to spell "world" backwards, and was only able to recall one of three previously named objects after a three-minute delay. (Id.) Allen reported to Dr. Loftin that she has constant problems with her short-term memory and concentration abilities. (Id.) Dr. Loftin found that she showed evidence of moderate impairment in her short-term memory, mild to moderate impairment in her ability to sustain concentration, mild to moderate impairment in her long-term and remote memory functioning, moderate impairment in her social relating, and moderate impairment in her ability to adapt to change. (Tr. 248–49.) He stated that Allen's mood at the time of the evaluation appeared depressed, anxious, and irritable, and her affect was mood congruent, sad, and irritated. (Tr. 245.) Dr. Loftin reported that he found no evidence of malingering throughout the interview, but noted that Allen was very forward in providing/volunteering information about her condition during pauses in questioning or before questioning about her symptoms began. (Id.) Dr. Loftin also noted that she did not seem to put forth full effort during the digit span test, but she seemed to put forth a reasonable effort in other parts of mental status screening and throughout the interview. (Id.) He ultimately diagnosed her with anxiety disorder and major depressive disorder and measured her GAF at 50 to 52. (Tr. 247.)

Dr. Andrew Phay, a medical consultant, examined Allen's records on April 25, 2011. (Tr. 252–68.) He also diagnosed Allen with major depressive disorder and anxiety disorder. Dr. Phay ultimately opined that Allen appeared able to remember locations and work like procedures and understand and remember simple and detailed one to three step tasks; perform simple and detailed one to three step tasks; maintain concentration for at least two hours, perform routine daily activities and complete a normal work week with acceptable performance/productivity; sustain an ordinary work routine around others and make acceptable simple and detailed work-related decisions; appropriately interact with the general public, supervisors, and peers in the work place with occasional disruptions due to psychologically based symptoms; maintain basic standards of neatness and cleanliness; be aware of and appropriately respond to changes and hazards in the work place on an infrequent basis; travel to unfamiliar places; and set and pursue realistic work goals in the work setting. (Tr. 268)

On October 25, 2012, Dr. Wood, Allen's treating psychotherapist, completed a psychological evaluation which he based on "nearly five years of observations, impressions, and appraisals of Ms. Allen's participation in diagnostic clinical interviews, participation in psychotherapy, mental status assessments and ongoing symptom evaluation." (Tr. 517.) He diagnosed her with PTSD, major depressive disorder, and panic disorder with agoraphobia and stated that "current diagnoses and associated symptoms represent a significant source of distress and impairment in social and potential occupational functioning." (Tr. 518–519.) He measured her GAF at 50. (Tr. 516.) He opined that she had major limitations in her ability to react appropriately to stressful situations, accept instructions and respond appropriately to criticism from supervisors, and complete a normal work day and work week without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable

5

number and length of rest periods. (Tr. 521.) Dr. Wood also opined that Allen had serious

limitations in her ability to maintain her attention and concentration for extended periods of two-

hour segments, and to get along with co-workers or peers without distracting them or exhibiting

behavioral extremes. (Tr. 521.) He also stated the following:

> Notable and affective symptom presentation includes commonly reported sadness, hopelessness, discouragement, "down in the dumps, tearfulness, fearfulness, and pessimism." Behavioral expression of these affective symptoms is noteworthy since they directly degrade functional capacity by compromising motivation, judgment, and quality of life. Further, significant agoraphobic symptoms are present and represent functional limitations by limiting social exposure.
>
> Cognitive disturbances that directly impact functional capacity are also characteristic of the current diagnoses and Ms. Allen exhibited several of these disturbances. She reported the typical complaints of an impaired ability to think clearly and make decisions, of information retention and retrieval problems, and distractibility. She admitted to occasional disorientation and forgetting important dates and appointments. These cognitive disturbances also extended to comprehension deficiencies, i.e., understanding written or verbal information is often difficult and she reported difficulty reading and interpreting written passages. She currently experiences some difficulty in storing, retaining, and recalling information and sustaining attention; she has moderate, but variable, problems with memory, attention, and concentration.
>
> More important to current levels of distress and functional capacity is the symptom cluster associated with PTSD and recurring Panic Attacks. Ms. Allen experiences PTSD symptoms that typically embody unwanted, recurring, intrusive thoughts ("flashbacks") of past abuse, nightmares, and acute anxiety episodes . . . . For Ms. Allen, uncued responses tend to be chronic, unpredictable, and are experienced as acute anxiety episodes. Cued reactions occur in response to a reminder of past abuse, recollections associated with an abusive person or period of time. Even televised arguments or loud noises precipitate intrusive recollections that often trigger a Panic Attack. Currently, the prospect of public exposure to arguments, disagreements, "tension", intense emotional displays, unexpected noises, or people reminiscent of past abusers reliably

produce acutely elevated anxiety, and a possibly debilitating Panic Attack.

Ms. Allen also exhibits some social withdrawal reflective of her current diagnoses. She typically remains socially isolated and uncommunicative for extended periods. . .

Based on interview and assessment results, it appears that past abuse has exerted a profound impact on Ms. Allen's attitude as well. . .

Thus, the helplessness that she experienced during the past abusive events, her inability to escape or change these events, has generalized to all aspects of her life. The uncontrollable nature of these events has permeated her life, her attitude, and her expectations of the world. The world is forever uncontrollable, dangerous, and unforgiving. This attitude represents substantial chronic distress and a subtly significant functional limitation that compromises personal effectiveness on multiple levels. This attitudinal style, which emerged following the abuse, is resistant to change and represents a primary focus of therapy.

Many years following critical abusive events, Ms. Allen's symptom expression remains notable. Results of her past abuse are readily observed in PTSD symptoms, anxiety, and depressed affect. Functional limitations are notable: concentration and attention difficulties that impact her personal life are present. Chronic autonomic arousal encourages anxiety and immediate reactivity. Avoidance of public exposure and environmental triggers lead to isolation and consistently limit social adaptation. Chronic anxiety and recurrent Panic Attacks continue to compromise personal effectiveness. She continues to experience significant distress and functional deficits that compromise her quality of life.

As mentioned, she is intensely fearful about intrusive thoughts and recollection of past abuse, is chronically reactive to certain common environmental cues, and actively avoids environmental stimuli that generate recall of past abuse. The fear and avoidance appear generalized and represent an entrenched sense of helplessness. This attitude results in a functional deficit in situations that are, by objective measure, minimally threatening or stressful; when she feels threatened, she becomes passively withdrawn and irritable. This combination suggests a phobic hypersensitivity that holds the potential for escalating agoraphobia,

increasing social isolation, and a deepening sense of helplessness and depression. A difficult cluster of symptoms to alter; symptom intensity reduction/symptom elimination prognosis is not favorable.

(Tr. 522–24.)

## II. CONCLUSIONS OF LAW

### A. Standard of Review

This Court reviews the final decision of the SSA to determine whether substantial evidence supports that agency's findings and whether it applied the correct legal standards. Miller v. Comm'r of Soc. Sec., 811 F.3d 825, 833 (6th Cir. 2016). Substantial evidence means "'more than a mere scintilla' but less than a preponderance; substantial evidence is such 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Id. (quoting Buxton v. Halter, 246 F.3d 762, 772 (6th Cir. 2001)). In determining whether substantial evidence supports the agency's findings, a court must examine the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." Brooks v. Comm'r of Soc. Sec., 531 F. App'x 636, 641 (6th Cir. 2013) (quoting Garner v. Heckler, 745 F.2d 383, 388 (6th Cir. 1984)). The agency's decision must stand if substantial evidence supports it, even if the record contains evidence supporting the opposite conclusion. See Hernandez v. Comm'r of Soc. Sec., 644 F. App'x 468, 473 (6th Cir. 2016) (citing Key v. Callahan, 109 F.3d 270, 273 (6th Cir. 1997)).

Accordingly, this Court may not "try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." Ulman v. Comm'r of Soc. Sec., 693 F.3d 709, 713 (6th Cir. 2012) (quoting Bass v. McMahon, 499 F.3d 506, 509 (6th Cir. 2007)). Where, however, an ALJ fails to follow agency rules and regulations, the decision lacks the support of substantial

evidence, "even where the conclusion of the ALJ may be justified based upon the record." Miller, 811 F.3d at 833 (quoting Gentry v. Comm'r of Soc. Sec., 741 F.3d 708, 722 (6th Cir. 2014)).

## B. The Five-Step Inquiry

The claimant bears the ultimate burden of establishing entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at § 423(d)(3). The SSA considers a claimant's case under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

1. A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2. A claimant who does not have a severe impairment will not be found to be disabled.

3. A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart B of the Regulations. Claimants with lesser impairments proceed to step four.

4. A claimant who can perform work that he has done in the past will not be found to be disabled.

5. If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Parks v. Soc. Sec. Admin., 413 F. App'x 856, 862 (6th Cir. 2011) (citing Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)); 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden through step four of proving the existence and severity of the limitations her impairments cause and the fact that she cannot perform past relevant work; however, at step five, "the burden shifts to the Commissioner to 'identify a significant number of jobs in the economy that accommodate the claimant's residual functioning capacity[.]" Kepke v. Comm'r of Soc. Sec., 636 F. App'x 625, 628 (6th Cir. 2016) (quoting Warner v. Comm'r of Soc. Sec., 375 F.3d 387, 390 (6th Cir. 2004)).

The SSA can carry its burden at the fifth step of the evaluation process by relying on the Medical-Vocational Guidelines, otherwise known as "the grids," but only if a nonexertional impairment does not significantly limit the claimant, and then only when the claimant's characteristics precisely match the characteristics of the applicable grid rule. See Anderson v. Comm'r of Soc. Sec., 406 F. App'x 32, 35 (6th Cir. 2010); Wright v. Massanari, 321 F.3d 611, 615–16 (6th Cir. 2003). Otherwise, the grids only function as a guide to the disability determination. Wright, 321 F.3d at 615–616; see Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). Where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's prima facie case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, typically through vocational expert testimony. Anderson, 406 F. App'x at 35; see Wright, 321 F.3d at 616 (quoting SSR 83-12, 1983 WL 31253, *4 (Jan. 1, 1983)).

When determining a claimant's residual functional capacity ("RFC") at steps four and five, the SSA must consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B),

10

(5)(B); <u>Glenn v. Comm'r of Soc. Sec.</u>, 763 F.3d 494, 499 (6th Cir. 2014) (citing 20 C.F.R. § 404.1545(e)).

### C. Plaintiff's Statement of Error

Allen's only argument is that the ALJ erred by failing to properly evaluate the medical opinion of her treating psychiatrist, Dr. Wood. (Doc. No. 13 at 6.) An ALJ must give a treating source's opinion controlling weight "if he finds the opinion 'well supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'" <u>Wilson v. Comm'r of Soc. Sec.</u>, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)). Even if the treating physician's opinion is inconsistent with other substantial evidence in the record, the treating physician's opinion is still entitled to deference and must be weighed using the following factors: (1) the length of the treatment relationship and the frequency of the examination; (2) the nature and extent of the treatment relationship; (3) supportability of the opinion; (4) consistency of the opinion with the record as a whole; and (5) the specialization of the treating source. <u>Id.</u>

The regulations require the ALJ to give "good reasons" for the weight given to a treating source's opinion. 20 C.F.R. § 404.1527(c)(2). Accordingly, a decision denying benefits has to state "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul. 96–2p, 1996 WL 374188 at *5 (1996); <u>see also</u> <u>Wilson</u>, 378 F .3d at 546 (remanding the case due to the ALJ's failure to follow these guidelines). This procedural safeguard "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." <u>Wilson</u>, 378 F.3d at 544.

The Sixth Circuit has held that ALJs should not give a treating source's opinion less than controlling weight solely because another medical source reaches a conflicting conclusion. Hensley v. Astrue, 573 F.3d 263, 266–67 (6th Cir. 2009) (remanding the case because the ALJ "made his own medical evaluation [by] reaching a conclusion that lay between the two conflicting absolute views of the physicians"). Social security disability cases often involve conflicting medical assessments. Id. If ALJs were allowed to disregard treating source opinions every time another source presented contrary conclusions, "it would be a rare case indeed in which [controlling] weight would be accorded." Id. Similarly, an ALJ's noncompliance with the treating physician rule cannot be excused just because his decision is otherwise supported by substantial evidence in the record. Wilson, 378 F.3d at 546. "[T]o recognize substantial evidence as a defense to non-compliance with § 1527(c)(2) would afford the Commissioner the ability [to] violate the regulation with impunity and render the protections promised therein illusory." Id.

Here, Dr. Wood qualifies as a treating source because he "has, or has had, an ongoing treatment relationship" with Allen. 20 C.F.R. § 404.1502. The ALJ ultimately chose to discount Dr. Wood's opinion as follows:

> [T]his opinion receives no significant weight since the objective records do not support this level of limitations. For example, [Allen] was able to maintain her attention and concentration during two psychological interviews. Exhibits 4F; 14F. This opinion also conflicts with Dr. Phay and Dr. Loftin's opinions. Exhibits 4F; 6F. Further, this doctor stated that the claimant's current behavioral symptoms behavior had been **expressed for about 25 years**. However, the claimant has been able to work during that period of time. Finally, this opinion appears to be mostly based on the claimant's subjective complaints. For example, she reported to this doctor that she had problems reading and interpreting written material. However, nothing else in the record reflects this problem.

(Tr. 20–21 (emphasis in original).)

The explanation above does not comport with the procedural requirements of § 1527(c)(2). First, although it is implicitly clear that the ALJ decided not to give Dr. Wood's opinion controlling weight, she failed to state whether the opinion was "well-supported by medically acceptable clinical and laboratory diagnostic techniques" or "inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). Even assuming the ALJ properly declined to give Dr. Wood's opinion controlling weight, she also failed to give "good reasons" for giving his opinion "no significant weight." Namely, she did not balance § 1527(c)(2)'s requisite factors, such as the length of the treatment relationship and frequency of examination, the nature and extent of the treatment relationship, and specialization of the treating source. The ALJ's entire characterization of Dr. Wood merely stated that he examined Allen in October 2012, that he "primarily treated [Allen's] husband," and he also rendered couples therapy to Allen and her husband. (Tr. 19.) This is insufficient and leaves out crucial information, such as that he is a clinical psychologist who treated her for five years.

The only factors the ALJ did seem to consider were the supportability of the opinion and the consistency of the opinion with the record as a whole. However, there are issues with the ALJ's analysis here as well. For example, the ALJ's conclusion that Dr. Wood's opinion is inconsistent with the objective records simply because Allen was able to concentrate during two psychological interviews is itself inconsistent with the record. The ALJ cited Dr. Loftin, whose opinion the ALJ accorded significant weight and who found that Allen had mild to moderate impairments in her ability to maintain concentration. (Tr. 246.) Dr. Phay also assessed her with the same. (Tr. 266–67.) The ALJ also cited Dr. Wood's interview, which found Allen to have moderate to major limitations with sustained concentration and persistence as well. (Tr. 521.) Dr. Wood saw Allen over one hundred times during the course of five years. In contrast, Dr. Loftin

only saw Allen one time. Although mental activities such as understanding and memory may be accurately assessed based on tests administered during a single visit, the Court is not convinced that the same can be said for sustained concentration and persistence. The ALJ similarly accorded great weight to Dr. Phay, who based his opinion on the review of the record and never saw Allen at all.

Moreover, the ALJ's contention that Dr. Wood's opinion conflicts with the opinions of Dr. Loftin, a non-treating doctor who examined Allen once, and Dr. Phay, a non-examining doctor, is a blanket assertion that does not take into account any of the consistencies between those opinions. For instance, Dr. Wood measured her GAF at 50, which indicates serious symptoms or serious impairment at functioning. Dr. Loftin measured her GAF at 50–52, which indicates moderate to serious symptoms or moderate to serious difficulty in functioning. The Life Care Center also "repeatedly measured her [GAF] at 45, indicating serious symptoms or serious impairment in functioning." (Tr. 18.) While GAF scores may be of limited value in and of themselves,[4] the scores here support Dr. Wood's general consistency with the opinions of the non-treating sources. Indeed, the main difference between Dr. Wood's opinion and the opinions of Dr. Loftin and Dr. Phay appears to be the intensity of Allen's symptoms, the former ranking them as more severe and the latter ranking them as more moderate.

Although the ALJ chose to discount the entirety of Dr. Wood's opinion, some of Dr. Wood's findings are unmistakably present among the various limitations in Allen's RFC assessment. For instance, the RFC assessment and Dr. Wood's functional capacities assessment both find that Allen is able to understand and remember simple and detailed instructions as well

---

[4] See Kornecky v. Comm'r of Soc. Sec., 167 F. App'x 496, 511 (6th Cir. 2006) ("[The Court is] not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score[.]").

as maintain basic standards of neatness and cleanliness. (Tr. 15, 521.) The Court realizes that in all likelihood, the ALJ did not rely on Dr. Wood's opinion, but rather on the opinion of the state-agency physicians, whose comments also match Allen's RFC assessment. (Tr. 18–19.) Nevertheless, it is relevant to the Court's analysis that certain findings by Dr. Wood, which the ALJ purported to give minimal weight, are consistent with, and in some cases identical to, the evidence relied upon to construct Allen's RFC. The Court also finds it notable that the ALJ found Allen to suffer from PTSD as a severe impairment, yet neither Dr. Loftin nor Dr. Phay diagnosed her with such—Life Care and Dr. Wood did. Combined, this calls into question whether Dr. Wood's opinion was discounted in its entirety or only in part.

It was also improper for the ALJ to discredit Dr. Wood's opinion on the basis that it appeared to be "mostly based on subjective complaints." (Tr. 21.) This reasoning is illogical because "psychology and psychiatry are, by definition, dependent on subjective presentations by the patient." Winning v. Comm'r of Soc. Sec., 661 F. Supp. 2d 807, 821 (N.D. Ohio 2009). "Taken to its logical extreme, the ALJ's rationale for rejecting [the treating psychologist's] conclusions would justify the rejection of opinions by all mental health professionals, in every case." Id.

Even if the other reason provided by the ALJ were legitimate, it is insufficient to overcome the errors in her application of the treating physician rule. As for the remaining justifications offered by the Commissioner in support of its argument that the ALJ properly evaluated Dr. Wood's opinions, the Court notes that it "may not accept appellate counsel's post hoc rationalizations for agency action. It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." Berryhill v. Shalala, 4 F.3d 993, 1993 WL 361792, at *6 (6th Cir. Sept. 16, 1993) (quoting Motor Vehicle Mfrs. Ass'n v. State

Farm Mut. Auto. Ins. Co., 463 U.S. 29, 50, 103 (1983)). "Courts are not at liberty to speculate on the basis of an administrative agency's order…. The court is not free to accept 'appellate counsel's post hoc rationalization for agency action in lieu of reasons and findings enunciated by the Board.'" Hyatt Corp. v. N.L.R.B., 939 F.2d 361, 367 (6th Cir. 1991). Thus, the Commissioner's post hoc rationalizations are not an acceptable substitute for the ALJ's lack of rationale concerning her treatment of the opinions of Allen's treating psychiatrist.

Although the ALJ's finding that Allen was not disabled ultimately may be justified, if an ALJ fails to explain why she rejected or discounted the opinions of the claimant's treating physician, and how those reasons affected the weight accorded the opinions, the Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 243 (6th Cir. 2007) (citation omitted). However, a violation of the treating physician rule can be deemed "harmless error" if (1) "a treating source's opinion is so patently deficient that the Commissioner could not possible credit it"; (2) "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion"; or (3) "where the Commissioner has met the goal of § 1527(d)(2) … even though she has not complied with the terms of the regulation." Wilson, 378 F.3d at 547. With respect to the last circumstance, "the procedural protections at the heart of the rule may be met when the 'supportability' of a doctor's opinion, or its consistency with other evidence in the record, is *indirectly* attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments." Friend v. Comm'r of Soc. Sec., 375 F. App'x 543, 551 (6th Cir. 2010) (emphasis in original) (citations omitted).

Here, the Court finds that none of the Wilson exceptions apply. The ALJ briefly discussed the treatment records from Life Care Center and Allen's medical doctor pertaining to

Allen's alleged mental limitations. (Tr. 18.) She analyzed the findings of two DDS doctors, one examining and the other non-examining. (Tr. 18–19.) She also reviewed the results of Dr. Wood's evaluation of Allen. (Tr. 19–20.) Although the ALJ did, to some extent, indirectly attack the consistency of Dr. Wood's opinion in relation to the record as a whole, the evidence she cites is simply insufficient to excuse noncompliance with § 1527(c)(2). See Nelson v. Comm'r of Soc. Sec., 195 F. App'x 462, 472 (6th Cir. 2006) (noting with respect to its decision to apply the harmless error exception "that this is the *rare* case of the ALJ's analysis meeting the goal of the rule even if not meeting its letter." (emphasis added). Furthermore, as noted above, despite the ALJ's decision to afford "no significant weight" to the entirety of Dr. Wood's opinion, some of the limitations noted therein were also reflected in the RFC assessment. This also weighs against the application of the harmless error rule. See Hall v. Comm'r of Soc. Sec., 148 F. App'x 456, 465 (6th Cir. 2005). Overall, the Court finds that the ALJ's failure to properly apply the treating physician rule does not constitute harmless error and remand is therefore required.

### III. CONCLUSION

For the reasons stated herein, the Motion for Judgment on the Record (Doc. No. 12) will be **GRANTED.** The case will be **REVERSED** and **REMANDED** pursuant to 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum Opinion.

An appropriate order will entered.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE